ORIGINAL

19MAG2954

Approved: _____
         JILAN J. KAMAL & DAVID R. LEWIS
         Assistant United States Attorneys

Before:   HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :   **SEALED**
                                      **COMPLAINT**
          - v. -                  :
                                      Violation of 18 U.S.C. §
CYNTHIA JORDAN,                   :   1343

          Defendant.              :   COUNTY OF OFFENSE:
                                      NEW YORK

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     KRISTIN MICHELLE ALLAIN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

COUNT ONE
(Wire Fraud)

     1.   From at least in or about 2009 until in or about 2016, in the Southern District of New York and elsewhere, CYNTHIA JORDAN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JORDAN, while an employee of a stock transfer and trust company ("Company-1"), engaged in a scheme to embezzle funds from Company-1 for JORDAN's personal use and benefit without permission or authorization, and in the course of executing such scheme, caused interstate wires to be sent.

     (Title 18, United States Code, Section 1343).

     The bases for my knowledge and the foregoing charges are, in part, as follows:

2.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2017, and I am currently assigned to a unit responsible for investigating economic crimes.

3.  I base this affidavit on my training and experience as well as on my conversations with others, including other law enforcement agents, and my examination of various reports and records. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

4.  As set forth below, CYNTHIA JORDAN, the defendant, was a senior employee at Company-1 involved in the management of Company-1's payroll system and a loan program Company-1 offered to its employees. From in or about 2009 through in or about 2016, JORDAN abused her responsibilities by embezzling approximately $696,144.27 from Company-1. JORDAN accomplished this fraud by making unauthorized wire transfers and disbursements via check from Company-1's accounts to her own personal bank accounts. JORDAN used portions of the money she stole to purchase a luxury sports car and other retail items.

### Background

5.  Based on my conversations with representatives of senior management at Company-1, as well as business records provided by Company-1, I have learned the following, in substance and in part:

   a. At all relevant times, CYNTHIA JORDAN, the defendant, was employed as the Vice President for Accounting and Human Resources at Company-1, which provides stock registration services to publicly and privately held companies. As a stock transfer agent, Company-1 was subject to regulation by the Securities and Exchange Commission ("SEC").

   b. In her capacity as the head of the Accounting Department at Company-1, JORDAN was responsible for overseeing and authorizing the disbursement of Company-1's payroll. To facilitate her role, JORDAN's account on the payroll system enjoyed "administrator" privileges, which allowed JORDAN to make direct changes to payroll disbursements. Only two employees at Company-1 enjoyed such "administrator access" to the payroll system: JORDAN and Company-1's President.

2

c. At all relevant times, Company-1 contracted with a third party, payroll-processing vendor to administer its payroll ("Payroll Company-1"). Using software provided by Payroll Company-1, JORDAN reviewed and, as necessary, adjusted the amounts owed to the employees' wages for each pay period. Routine adjustments to an employee's payroll included, for instance, changes to 401K contributions, benefit insurance contributions, or tax withholding. Any adjustments to employee payroll had to be captured and categorized as one of a pre-set list of authorized, itemized adjustments (such as, for example, tax withholding and medical insurance premiums), and were reflected on the employee's wage report for a given pay period. After reviewing the payroll for a given pay period, JORDAN authorized the transfer of funds needed to pay the employees' wages from a Company-1 bank account, located at a Manhattan branch of a national bank ("Bank-1"), to the bank account of Payroll Company-1, located at a Chicago branch of a Midwestern regional bank ("Bank-2").

d. In addition to overseeing and authorizing the disbursement of payroll, JORDAN's responsibilities included oversight of a loan program that Company-1 offered to its employees. To obtain such a loan, employees needed to enter into a contract or promissory note to obtain the loan and, if the amount was in excess of $1,000, top obtain the approval of at least one senior Company-1 executive. If approved for such a loan, the employee received the loan proceeds as a lump sum disbursement via check. Employees repaid such loans through deductions, itemized as such, from their wages over time. Loan repayment deductions were reflected on the employee's paystub, with corresponding deductions reflected in the payroll system. Employee loans were not, however, disbursed via the payroll system because they were drawn from a different Company-1 bank account.

The Embezzlement Scheme

6. Based on my review of Company-1's accounting records, bank records, and through conversations with the Controller of Company-1 ("Company-1 Controller"), among other Company-1 senior executives, I have learned the following, in substance and in part:

a. Between approximately 2009 and 2016, CYNTHIA JORDAN, the defendant, embezzled approximately $696,144.27 from Company-1. JORDAN accomplished this by exploiting her access to and authority over the Company-1 payroll system and her access to Company-1 bank accounts in a number of different ways. These include, but are not limited to, the following examples:

3

b.      Between in or around May 2009 and in or around July 2016, JORDAN authorized approximately 59 "overtime" payments to her payroll disbursements, totaling approximately $80,241.19. As the Vice President of Accounting, JORDAN was an officer of Company-1 and, as such, not entitled to overtime payments.

c.      Between in or around April 2009 and in or around June 2016, 111 of JORDAN's paychecks reflect unauthorized adjustments, resulting in an excess $213,794.51 in payroll disbursements to which she was not entitled. These unauthorized overpayments were classified in a number of ways, chiefly as loans for which no documentation or record of repayment exists.[1] Moreover, although a security feature on the payroll system required that certain adjustments to the payroll system (such as changes to an employee's pay rate), required a second payroll system administrator's approval, payroll records reflect that JORDAN maintained two administrator login profiles on the payroll system. Based on my training and experience and familiarity with this investigation, I believe that the existence of these two login profiles would have enabled JORDAN to authorize adjustments to her own payroll profile, disbursements, and deductions without seeking other approvals.

d.      Between in or around March 2009 and in or around May 2016, JORDAN received hardcopy checks totaling approximately $328,917.94 made out to her from two separate bank accounts used by Company-1 ("Corporation Account-1" and "Trust Account-1"). Company-1 drew upon Corporation Account-1 for legitimate employee loans, however, there exist no records that JORDAN obtained approval for, entered into a contract for, or ever repaid any such loan. Company-1 drew upon Trust Account-1 to reimburse employee travel expenses, however, there exist no records to indicate that JORDAN incurred any such travel expenses, nor could senior management at Company-1 recall authorizing any checks or reimbursements for JORDAN from the Trust Account-1, who did not routinely travel for work. Moreover, in her role as the Vice President for Accounting, JORDAN had ready access to the safe where the Corporation Account-1 and Trust Account-1 checkbooks were stored, as well as the signature stamps of the authorized signatories. The vast majority of the checks were signed using a

---

[1] In fact, at no time during the relevant period did Company-1 disburse employee loans via employee payroll. This is because, as set forth in paragraph 5(d) *supra*, such loans were drawn from a different Company-1 bank account than payroll. By contrast, CYNTHIA JORDAN's, the defendant's, payroll records and paystub reflect line item *additions* to her payroll classified as "loans."

4

signature stamp. Based on the foregoing—and the fact that all such checks were deposited into JORDAN's personal bank accounts—I believe that JORDAN used her access to the Corporation Account-1 and Trust Account-1 to issue unauthorized checks to herself.

   e.  Between in or around January 2009 and January 2014, JORDAN's personal bank accounts received 21 wire transfers totaling $73,190.63 directly from the Corporation Account-1 and the Trust Account-1, for which there is no justification or authorization. I have spoken with a senior executive of Company-1 ("Executive-1"), who at all relevant times was responsible for authorizing disbursements from Corporation Account-1. Executive-1, explained, in substance and in part, that employee loans are not generally disbursed via direct wire transfer and that he had not authorized such wire transfers to JORDAN. I have also spoken with another senior executive of Company-1 ("Executive-2") and Company-1 Controller, both of whom confirmed that there exists no legitimate reason for funds to be transferred directly via wire from Trust Account-1 to JORDAN.

  7.  I have reviewed bank records of CYNTHIA JORDAN, the defendant, and I have learned the following, in substance and in part:

   a.  Virtually all the unauthorized disbursements set forth above were deposited into bank accounts held in the name of JORDAN, although at least one was deposited into the bank account of a family member.

   b.  Bank account activity reflects that JORDAN used the embezzled funds, in part, to finance the purchase of a luxury sports car, and other retail items.

  8.  In or about the summer of 2016, the SEC conducted an on-site, transfer-agent examination of Company-1. I have spoken to senior executives of Company-1 regarding this SEC examination, and have learned the following, in substance and in part:

   a.  In the course of its examination, the SEC asked Company-1 to produce payroll records relating to CYNTHIA JORDAN, the defendant. A representative of Company-1, in turn, asked JORDAN to produce the records requested by the SEC. In response, JORDAN produced to Company-1 documents that were inconsistent with payroll records of Payroll Company-1, and that were also inconsistent with Company-1's own records when accessed independently of JORDAN. Subsequent examination by Company-1 revealed that the payroll documents that JORDAN had provided to Company-1 had been altered to conceal overpayments to her.

b. Thereafter, executives of Company-1 asked JORDAN to produce additional payroll-related records pertaining to her compensation. Upon receiving this request, and upon learning that Company-1 had requested related documentation from Payroll Company-1, JORDAN did not report to work for several days. When JORDAN did return, on or about August 5, 2016, JORDAN met with a number of Company-1 executives, including Company-1 Controller. In JORDAN's conversation with Company-1 Controller, JORDAN stated, in substance and in part, that she assumed Company-1 Controller had discovered that JORDAN had been "taking money" and that JORDAN had worked for Company-1 for many years and believed that she had been underpaid. In a conversation with Executive-2 that same day, JORDAN purported to justify her actions by stating, in substance and in part, that JORDAN had large personal expenses.

WHEREFORE, I respectfully request that an arrest warrant be issued for CYNTHIA JORDAN, the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

KRISTIN MICHELLE ALLAIN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25 day of March, 2019

Honorable Katharine H. Parker
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

6